UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA : Case No. 1:21-cr-296 (RDM)

v.

JEFFREY GRACE,

Defendant.

GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Jeffrey Grace to six months' incarceration, 12 months' supervised release, 60 hours of community service, and $500 restitution.

## I. Introduction

Defendant Jeffrey Grace, a 64-year-old former long haul trucker, traveled with his adult son, Jeremy Grace (*United States v. Jeremy Grace,* 21-cr-492 (RDM)), to Washington, D.C., from their respective homes in Battle Ground, Washington, and participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars' in losses.[1]

[1]As set forth in the Statement of Offense in this matter, filed on April 3, 2023, ECF 48, the approximate losses suffered as a result of the siege at the United States Capitol were $2.88 million. That amount reflects, among other things, damage to the United States Capitol Building and grounds and certain costs borne by the United States Capitol Police.

On April 3, 2023, over two years after he was initially arrested and almost a full year after his son pleaded guilty, Grace pleaded guilty to one count of violating 18 U.S.C. § 1752(a)(1) (Entering or Remaining in a Restricted Building or Grounds), a Class A Misdemeanor. As explained herein, a sentence of six months' incarceration is appropriate in this case because of the numerous aggravating circumstances. In particular, Grace: (1) was a "probate" of the Proud Boys extremist group, traveled to D.C. with other high-level Proud Boy members, and on the morning of January 6, walked with an organized group of Proud Boys to approach the Capitol; (2) when approaching the U.S. Capitol Building on January 6, positioned himself only a few feet behind other front-line rioters who toppled and pushed through barricades and broke through the police lines (*See* Images 1, 2, and 3); (3) was among the very first wave of rioters who unlawfully entered the U.S. Capitol Building, entering at approximately 2:23 p.m., just three minutes after the Vice President and members of Congress began evacuating; (4) pressed forward into the Rotunda, despite witnessing flash bangs, tear gas, and other rioters destroying and appearing to steal federal property, including one who appeared to steal a Congressional lectern (*See* Images 4 and 5); (5) left the Capitol building by climbing through a broken window; (6) responded to the surrounding violence and destruction by proudly posing for selfie-style photos and videos outside and inside the U.S. Capitol Building, where he gleefully chanted "Our House, Our House," "It gets no better than this," and "God bless America"; (7) later destroyed evidence by deleting from his cell phone the incriminating selfie-style photos and videos and deleting his accounts on the encrypted messaging platforms Signal and Telegram; (8) later falsely claimed to agents of the Federal Bureau of Investigation ("FBI") that his son never entered the U.S. Capitol Building and falsely claimed that he was not associated with the Proud Boys; (9) months later tried to profit financially from his participation in the January 6 riot by launching the "Our House USA" YouTube channel and

websites and creating a business that manufactured and sold clothing and other paraphernalia with phrases such as "Our House" and "Back the Blue" emblazoned on them, and then attending in-person sales events with his son to hawk his wares; (10) made numerous public statements in the press and on his social media pages admitting his criminal conduct while unapologetically blaming the government, declaring himself a patriot, and criticizing (and confirming the identity of) a cooperating witness involved in his prosecution; and (11) waited two years before pleading guilty.

The Court must also consider that Grace's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts and circumstances of Grace's crime support a sentence of six months' incarceration in this case, a sentence that is at the high end of the parties' agreed upon U.S. Sentencing Guidelines range.

## II. Factual and Procedural Background

### ***The January 6, 2021, Attack on the Capitol***

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 48 (Statement of Offense) at ¶¶ 1-7.

### ***Grace's Role Before and During the January 6, 2021, Attack on the Capitol***

On January 4, 2021, Grace traveled with his son, Jeremy Grace, from their respective homes in Battle Ground, Washington, to Washington, D.C., ostensibly to attend the rally in support of Donald Trump. *See* ECF 48 at ¶ 8. Grace brought several pocketknives with him on his travels. They traveled and stayed at an Airbnb-type hotel with Grace's friend, Individual A, who was known to Grace to be a higher-level member of the Proud Boys group from the same region. According to evidence found on Grace's cell phone, at the time, Grace was a "probate," or

probationary member, of the Proud Boys and had been attending Proud Boys meetings, gatherings, and rallies. On the evening of January 5, Grace, his son, Individual A, and Ethan Nordean, a leader of the Proud Boys, attended a gathering of Proud Boys from around the country held at an Airbnb-type house. Joseph Biggs, who Grace also knew to be another Proud Boy leader from Florida, also attended the gathering.[2]

On January 6, at about 10 a.m., Grace and his son convened with a large group of Proud Boys at the Washington Monument, while former President Trump's rally was underway at the Ellipse, near the White House. The Graces walked with the Proud Boys from the Washington Monument toward the U.S. Capitol Building. On the grounds outside the U.S. Capitol Building, Grace and his son were positioned a few feet behind the front line of rioters who were confronting barricades and police officers standing near those barricades as others were knocking over the barricades and pushing past the line of officers. *See* Image 1 and ECF 31 at ¶ 9. Grace, appearing in the screenshots set forth as images in this memorandum, was wearing or holding a camouflage-style jacket, a dark shirt with a Betsy Ross-style American flag on the front, a dark hoodie-style sweatshirt, and a dark baseball cap. His son, who was frequently positioned nearby, wore an American flag-themed red, white, and blue baseball cap, with "1776" on the front in white print and a grey sweatshirt with a Betsy Ross-style American flag on the front in black print.

[2] On May 4, 2023, after a lengthy jury trial, several individuals associated with the Proud Boys, including Ethan Nordean and Joseph Biggs, were convicted of multiple crimes associated with their activities on January 6, 2021, including seditious conspiracy, obstruction of an official proceeding, and conspiring to prevent federal officers from discharging their official duties. See *United States v. Ethan Nordean et al*, 21-CR-175.



*Image 1: Jeffrey (right circle) and Jeremy Grace (left circle) outside the U.S. Capitol Building*

Grace and his son proceeded toward the U.S. Capitol Building. At the West Terrace Plaza, Grace and his son were again positioned a few feet behind the front line of rioters who were confronting and pushing past a line of law enforcement officers standing guard. *See* Images 2 and 3. As he entered the Capitol grounds, Grace observed fences and other physical barricades that rioters had toppled over and saw other rioters breach lines of law enforcement officers. He heard flash bangs and saw people being tear gassed.



*Image 2: Jeffrey (left circle) and Jeremy Grace (right circle) approaching the West Terrace Plaza*



*Image 3: Jeffrey (left circle) and Jeremy Grace (right circle) approaching the West Terrace Plaza*

At approximately 2:23 p.m., three minutes after Senators and House Members began evacuating their respective chambers, Grace and his son were among the first wave of rioters who entered the U.S. Capitol Building. They entered through the Senate Wing Door on the northwest side. *See* Image 4.



*Image 4: Jeffrey (right circle) and Jeremy Grace (left circle) entering the U.S. Capitol Building via Senate Wing Door*

As he entered the building, Grace saw other rioters climbing through broken windows. Once inside the building, they walked together to the Rotunda. They entered the Rotunda at approximately 2:25 p.m. from the north entrance and remained inside the Rotunda for approximately five minutes. *See* ECF 48 at ¶ 10. While inside the Rotunda, Grace stood close to and watched as another rioter appeared to steal a Congressional lectern. *See* Images 5 and 6.



*Image 5: Jeffrey (right circle) and Jeremy Grace (left circle) in the Rotunda watching another rioter attempting to steal a Congressional lectern.*



*Image 6: Jeffrey (left circle) and Jeremy Grace (right circle) in the Rotunda in a widely circulated photograph depicting another rioter attempting to steal a Congressional lectern.*

When Grace was both inside and outside the U.S. Capitol Building, Grace's son used his cell phone to take several selfie-style videos and photographs of the two of them. *See* Image 7. His son later sent the images to him. In one video, taken at approximately 2:18 p.m., Grace and his son are depicted outside the U.S. Capitol Building, while both repeatedly chanted, "Our house." In another video, taken at approximately 2:25 p.m., Grace and his son are depicted inside the Rotunda. In the video Grace's son stated, "Just made it into the Capitol here. Oh yeah, oh yeah." Grace stated, "It gets no better than this." Grace's son then stated, "Freedom." Grace replied, "God bless America." *See* ECF 48 at ¶ 11. *See* Image 7.



*Image 7: Jeffrey (right) and Jeremy Grace (left) inside the Rotunda*

In order to exit the building, Grace climbed out a broken window, adjacent to the door through which they initially entered. *See* Image 8. At approximately 2:31 p.m., they exited the U.S. Capitol Building. *See* ECF 48 at ¶ 10.



*Image 8: Jeffrey (left circle) and Jeremy Grace (right circle) exiting the U.S. Capitol Building, heading toward broken window near Senate Wing Door*

***Grace's Deletion of Evidence and False Statements to Law Enforcement Officers***

The photograph, Image 6 above, of the rioter with the Congressional lectern, with Grace and his son visible in the background, was widely disseminated in the media. On or before January

8, Grace deleted from his cell phone the selfie-style videos and photographs that his son had taken and transferred to him on January 6. *See* ECF 48 at ¶ 11. Grace voluntarily agreed to two interviews with the FBI. During the first interview on January 21, 2021, conducted in person, Grace admitted that he traveled to Washington, D.C. with his son and that Grace entered the U.S. Capitol Building on January 6. But Grace falsely told the interviewing agent that he became separated from his son, and he did not believe that his son entered the U.S. Capitol Building. He also falsely implied that, although he knew people who were members of the Proud Boys and other such groups, he was not associated with the group. Shortly after, and in response to this interview with the FBI, Grace deleted his accounts on two encrypted messaging platforms Signal and Telegram. Text messages found on Grace's cell phone between Grace and another suspected Proud Boy member showed Grace discussing his concerns about the investigation and his deletion of his accounts. In his second interview on May 5, 2022, conducted by phone and pursuant to an earlier plea agreement that Grace later abandoned, Grace admitted that his son also entered the Rotunda with him.

***Grace's Capitalizing on His Participation in the January 6 Riot***

In the aftermath of January 6, Grace launched various commercial efforts to capitalize on his participation in the January 6 riots. With help from his daughter-in-law, Grace operated a YouTube channel called "Our House," where he posted videos, raised funds for himself, and described his various travels, including videos he labeled "August 9," "Yesterday at the Waterfront," "From El Paso," "350 Illegals Came Through Here Today," and "Police Encounter." As recently as July and August 2021, Grace, with his son and daughter-in-law's help, sold t-shirts, baseball caps, water bottles, decals, and other paraphernalia with phrases like "Our House," "These Colors Don't Run," "Back the Blue," and images of the U.S. Capitol Building, some with an

American flag, emblazoned on them. He advertised on social media and attended in person sales events. On his Instagram account, "ourhouseusa," Grace advertised his t-shirts, stating that "Proceeds . . . will help strengthen our mission to get back the America we love. The one that's founded on freedom. This is Our House. Let's get it back. #ourhouse #freedom #America #uws." Set forth below is another post showing Grace selling his paraphernalia.




***Grace's Statements to the Media and On His Social Media***

Grace made numerous statements in the media and on his public-facing social media accounts indicating that he knew he committed a crime, was willing to go to jail for those crimes, believed his crimes were patriotic acts, and had no remorse for his actions. For example, in an interview that Grace gave to the KATU television station, Grace stated, "It was a patriotic act. Was it legal? No." "Is it okay to protest? Yep." "Did I know it was illegal to go in through those doors? If I didn't, then there is something wrong with me, right?" "There was a lot of love there [U.S. Capitol on January 6, 2021]. Way more love than destruction." "Did I have the right to go in? I guess not. Because it's illegal. But did I do anything wrong? No, I didn't. I helped. Does that justify it? No. Does it justify it in my heart? Yeah." "Do I want to go to jail, slash prison?

Absolutely not. But am I willing to go for our country? For what I believe, we need to draw back together? I guess so."

He also repeatedly expressed his hostility toward law enforcement, his continued belief in his patriotism, and his utter lack of remorse. In one public-facing post, Grace stated, ‘"Really is that all you have FBI, it is almost humorous . . . How about maybe they really didn’t like me saying God bless America in the rotunda??? Whatever tactics and straws they are grasping at they’re not going to work. Once again for the record I am an American, God loving, constitution believing, patriot who will stand . . . . I have to say I would handle the situation the exact same way . . . I will stand up for what is right. God bless America. And once again it is OUR HOUSE."

Furthermore, when Grace learned during discovery that one of his traveling companions was a cooperating witness, he identified him by first name and last name on his social media, criticized him, and suggested that he was an FBI plant that had entrapped him.

***Grace’s Armed Confrontations in Texas and Oregon, and Resulting Revisions of His Conditions of Pretrial Release***

As set forth in the government’s successful and unopposed motion to modify Grace’s conditions of pretrial release to prohibit his possession of firearms, ECF 19, on or about July 20-22, 2021, Grace traveled with a group from Battle Ground, Washington, to in and around El Paso, Texas, near the border with Mexico. (Grace notified the Pretrial Services Agency in D.C. in advance of his travel to Texas). Grace and his group apparently went out at night in an effort to record individuals he suspected of illegally crossing into Texas from the Mexico border. Grace was armed when police confronted him. Grace and his group were not arrested. Grace also visited an Immigration and Customs Enforcement (“ICE”) facility. In one video that Grace posted on his “Our House” YouTube channel, he described his police encounter and posted a recording of a police response to a report of armed individuals outside an ICE facility.

Then on or about August 7, 2021, the defendant traveled with part of a larger group from his home in Battle Ground, Washington, to Portland, Oregon, about 30 minutes away. As he later described it on his "Our House" YouTube channel, Grace went to Portland in order to provide "perimeter security" for a pastor who was giving a speech. According to Grace, the pastor and other attendees were confronted by "Antifa" members. It appeared that Grace was carrying a firearm and at times holding what appeared to be a baton. Grace could be seen at times with his hand on what appeared to be his side-holstered firearm, which was displayed in full view. Other videos appeared to depict Grace and his group in Portland confronting another individual under a bridge. Grace could be seen shoving the other individual. Later, on Grace's YouTube channel, he explained that he attended the Portland event and was providing "perimeter security." He stated that he would "give some back" to "Antifa" in the future, that he was looking forward to the next event, and that he would "do it again proudly."

***The Charges and Plea Agreement***

On January 21, 2021, the United States charged Grace by criminal complaint with violating 18 U.S.C. § 1752(a)(1) (unlawful entry of a restricted building). ECF 1. On February 4, 2021, law enforcement officers arrested Grace at his home in Battle Ground, Washington. ECF 7. On April 12, 2021, Grace was charged in a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). ECF 9. After several false starts, on April 3, 2023, over two years after his arrest, Grace pleaded guilty, pursuant to a written plea agreement, to Count One of the Information, charging him with a violation of 18 U.S.C. §

1752(a)(1), unlawful entry of a restricted building. ECF 47, 48.[3] By plea agreement, Grace agreed to pay restitution of $500. *Id.*

## III. Statutory Penalties

Grace now faces sentencing on a single count of violating 18 U.S.C. § 1752(a)(1). As noted in the plea agreement, ECF 47 at ¶ 1, and in the U.S. Probation Office's Pretrial Service Report ("PSR"), Grace faces up to one year of imprisonment; a fine of up to $100,000, pursuant to 18 U.S.C. § 3571(b)(5); a term of supervised release of not more than one year, pursuant to 18 U.S.C. § 3583(b)(3); and an obligation to pay any applicable interest or penalties on fines and restitution not timely made. Grace must also pay restitution. *See* ECF 47 at ¶ 15. *See also* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class A Misdemeanor, *see* 18 U.S.C. § 3559(a)(6), the Sentencing Guidelines apply. *See United States v. Maul*, 205 F. App'x 456, 458 (7th Cir. 2006) (unpublished). 18 U.S.C. § 1752(a)(1) is a Class A Misdemeanor.

## IV. The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* The United States Sentencing Guidelines ("U.S.S.G.," "Sentencing Guidelines," or "Guidelines")

---

[3] On April 28, 2022, over a year after his arrest, Grace, through his then-attorney, informed the Court that he intended to plead guilty, and the Court scheduled his change of plea hearing for June 17, 2022. ECF 34 and Minute Order for April 28, 2022. Grace then changed his mind, and the change of plea hearing was cancelled. In the meantime, Grace was appointed new counsel, after his assigned Assistant Federal Public Defender retired. On December 20, 2022, at Grace's request, the Court replaced Grace's second appointed counsel with a third appointed counsel. Minute Order dated December 20, 2022.

are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.*

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Grace's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | 4 |
| Specific Offense Characteristics | |
| Restricted Building (U.S.S.G. §2B2.3(b)(1)(A)) | 2 |
| Acceptance of Responsibility (U.S.S.G. §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 4 |

*See* PSR at ¶¶ 32-40.

The U.S. Probation Office calculated Grace's criminal history as a category I, which is not disputed. PSR at ¶ 43. Accordingly, the U.S. Probation Office calculated Grace's total adjusted offense level, after acceptance, at 4, and his corresponding Guidelines imprisonment range at 0-6 months. PSR at ¶¶ 40, 66. Grace's plea agreement contains an agreed-upon Guidelines calculation that mirrors the U.S. Probation Office's calculation.

Here, while the Court must consider all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness.

**Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is next guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. As described below, the Section 3553(a) factors weigh in favor of the recommended sentence of six months' incarceration.

**A. The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Grace's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Grace, the absence of violent or destructive acts is not a mitigating factor. Had Grace engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors is that Grace skipped the "Stop the Steal" rally, marched alongside a group of his fellow Proud Boys, and was among the very first wave of rioters who illegally entered the U.S. Capitol Building and entered the Rotunda. Grace stood by while other rioters only a few feet ahead of him toppled over barricades and confronted and pushed pass a line of police officers. Once inside the Rotunda, Grace was undeterred by other rioters apparently stealing property. Grace stood inches away from and looked directly at another rioter who appeared to be stealing a Congressional lectern. Grace's immediate reaction to the mayhem and destruction surrounding him was to pose for his son while he took selfie-style videos and photographs, smiling and chanting "patriotic" slogans like "Our House" and "God Bless America."

Grace's conduct in the aftermath of January 6 further supports the government's recommended six-month custodial sentence in this case. He destroyed incriminating "selfie"-style videos from his cell phone, he deleted his accounts on encrypted communications platforms, and he lied to FBI agents when interviewed. Grace attempted to capitalize on his criminal conduct, launching a business to sell "Our House" paraphernalia. The irony, not to mention audacity, of selling "Back the Blue"-labeled paraphernalia in the context of January 6 is especially disturbing. On January 6, Grace watched other rioters physically and verbally confront law enforcement officers. Moreover, by the time Grace hawked these "Back the Blue" products, he was likely aware of the widely reported physical and emotional injuries suffered by law enforcement officers on January 6. He then lied to the very types of law enforcement agents he claimed to "back" and support. Grace was disrespecting, not "backing," the blue.

Grace's other actions after January 6 are also disturbing. They show a complete lack of remorse for and appreciation of the criminality of his conduct, which in turn increases the likelihood of recidivism. He made public statements in the media and on his social media in which he mocked law enforcement, insisted that he was a patriot, claimed he would "do it all again" if given the chance, and arguably endangered a cooperating witness by identifying him by name, while criticizing him. His engagement in armed "vigilante"-style conduct in Portland and El Paso, including apparently striking an individual, *while he was on pretrial release*, is also alarming. That, coupled with his two-year delay in pleading guilty, are indicative of a lack of remorse. Quite simply, Grace "doesn't get it." He views himself as a patriot and victim, and he seems to have no appreciation for the wrongful nature of his conduct.

**B. Grace's History and Characteristics**

Grace is 64 years old, formerly a long-haul trucker, and now works at a sporting goods store. Grace served as an enlisted person in the U.S. Navy. While Grace's military service is laudable, it renders his conduct on January 6 all the more troubling. As a former military member, Grace was well aware that he had no right to enter restricted government buildings. His voluntary decision to storm a guarded government building is that much more disturbing in light of his former military service and training.

**C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol Building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

**D. The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most

compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest, as this Court has previously noted. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of this Court). It is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Grace's actions on January 6, his words, his blatant lies to the FBI during his interview, his deletion of evidence, his vigilante conduct while on pretrial release, and his capitalizing on his wrongdoing clearly demonstrate the need for specific deterrence for this defendant. Grace was mere feet behind the front line, pushing past the police line not once but twice. As Grace

unlawfully entered the U.S. Capitol Building with a crowd of rioters, he saw broken windows, he knew the police had deployed tear gas, and he saw an individual attempting to steal a wooden lectern from the Rotunda. As of the date of this filing, Grace has not expressed remorse. When interviewed by the FBI at the time of his arrest, he repeatedly lied and claimed that his son never entered the U.S. Capitol Building and denied being associated with the Proud Boys.

**E. The Need to Avoid Unwarranted Sentencing Disparities**

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] This Court must sentence Grace based on his own conduct and relevant characteristics, but it should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017).

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Jeremy Grace*, 21-cr-492, this Court imposed a 21-day sentence of incarceration on Grace's son, who, like the defendant, also pleaded guilty to violating 18 U.S.C. § 1752(a)(1). Jeffrey Grace is considerably more culpable than his son, which supports a significantly longer sentence. Jeffrey Grace took the initiative and invited Jeremy Grace to travel to Washington, D.C. It was Jeffrey Grace, not Jeremy, who had the connections with the Proud Boys and decided to travel with, stay with, meet with, and walk to the U.S. Capitol Building with Proud Boys and their leaders. It was Jeffrey Grace who launched the "Our House" business; Jeremy Grace played a secondary role and helped his father. Jeffrey Grace alone, while on pre-trial release, engaged in armed vigilante conduct. Jeffrey Grace alone gave interviews to the media and posted on his own social media, making antagonistic comments, claiming to be a patriot-victim, and almost baiting the government to charge him with additional crimes. Finally, Jeremy Grace indicated shortly after his arrest that he intended to plead guilty; whereas Jeffrey Grace waited over two years after his arrest to do so.

In *United States v. Adam Johnson*, 21-cr-648, Judge Walton imposed a sentence of 75 days' incarceration, followed by 12 months of supervised release. In that case, the defendant, like Grace, pleaded guilty to violating 18 U.S.C. § 1752(a)(1). Johnson, who is depicted in the photograph of Grace in Images 5 and 6, entered the Rotunda and temporarily stole and carried the podium belonging to the Speaker of the U.S. House of Representatives, for an apparent "photo op." There

are several key similarities. Both pleaded guilty to the same crimes; both were at or near the front line of rioters who breached the Capitol; both witnessed other rioters destroying property and physically confronting law enforcement; both observed officers deploying tear gas and flash bangs to disburse the crowd; both entered through doors that were adjacent to rioters climbing through broken windows; and both destroyed electronic evidence after the fact, deleting photos and other evidence from their cell phones.

There are some notable differences between Grace and Johnson. Grace, unlike Johnson, lied to law enforcement officers, and he attempted to profit off his criminal activity. Grace was a "probate" of the Proud Boys, while Johnson was not. Johnson remained in the U.S. Capitol Building for 35 minutes and traveled to various other parts of the building, whereas Grace was there for eight minutes and only went to the Rotunda. Moreover, unlike Grace, Johnson temporarily stole the podium.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## V. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Grace to six months' incarceration, 12 months' supervised release, 60 hours community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By: *_/s/ Mona Sedky_*

MONA SEDKY
Special Assistant United States Attorney
U.S. Attorney's Office
601 D Street, N.W., 5th Floor
Washington, D.C. 20530
202-262-7122
Mona.Sedky2 @usdoj.gov